| | |
|---|---|
| **District Court, City and County of Denver, Colorado**<br>1437 Bannock Street<br>Denver, CO 80202<br>720-865-8301<br><br>**Plaintiffs:**<br>RICHARD LANG<br>v.<br><br>**Defendants and Cross Claimants:**<br>TIMOTHY FLAHERTY, TIMOTHY KNEEN, CARL VERTUCA and PdC, LLC<br><br>And<br><br>Riviera Country Club, S. de R.L. de C.V. ("RCC")<br>**Third Party Plaintiff**<br><br>v.<br><br>**Cross Claim Defendant:**<br>Michael Joseph Roberts, Sr.<br><br>And<br><br>**Third Party Defendants:**<br>Michael J. Roberts, LLC<br>Sandstone Ventures LLC | ▲                    ▲<br><br>**COURT USE ONLY** |
| Attorneys for Cross Claim Defendant<br>Robert Alan Kitsmiller - #16927<br>Podoll & Podoll, P.C.<br>5619 DTC Parkway, Suite 1100<br>Greenwood Village, CO 80111<br>Telephone: (303) 861-4000<br>Email: bob@podoll.net | Case Number: 2015cv31828<br><br>Division: 409 |

### AFFIDAVIT OF DAVID LOPEZ

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

1

Appeared before me on this 11th day of December 2020, David Lopez, who, upon his oath, stated as follows:

## I. Introduction

1.1   My name is David Lopez. I am over 18 years of age. I am duly licensed to practice law in the states of Texas and California and am a partner with the U.S.-Mexico law firm of Cacheaux, Cavazos & Newton, LLP, which has 3 offices in Texas and 8 offices in Mexico. A true and correct copy of my curriculum vitae describing my employment and educational background is attached hereto as **Exhibit 1**.

1.2   The Mexican legal system is the central focus of my scholarly and research interests. Beginning in January 1994, I taught law school courses involving various aspects of the Mexican legal system, including North American Legal Systems (Comparative Law: U.S., Mexico, and Canada) and the North American Free Trade Agreement (NAFTA). I wrote the chapter on "The Legal System of Mexico" that appeared in William Hein & Co.'s 20-volume <u>Modern Legal Systems Cyclopedia</u> in 2000. I also wrote the brief chapter on "Mexico's Legal System" that appeared in 2002 in Transnational Publisher's <u>Doing Business in Mexico</u> series. In 2004, the book titled <u>Mexican Law</u> that I co-authored was published by Oxford University Press. My co-authors are a recently retired Justice of the Supreme Court of Mexico, two professors at one of Mexico's top law schools (ITAM) and the former Dean of the University of Houston Law Center. In connection with this work, I have, during the past 25 years, conducted intensive research into the structure and operation of Mexico's legal system at the national and state levels.

1.3   I have taught and lectured in Mexico concerning matters of U.S. and Mexican law. In 1996, 1997, 1998, 1999 and 2000, I served as a visiting professor at the Universidad Autónoma de Guadalajara in connection with Baylor Law School's Study Abroad Program. I have delivered lectures on various occasions to Mexican judges, lawyers, and law students in Mexico City, Guadalajara, Monterrey and Veracruz, Mexico, and Austin and San Antonio, Texas.

From 2001 to the present, I have been involved in an international law practice representing Mexican clients in lawsuits pending in the United States and in international arbitration involving issues of Mexican substantive and procedural law and representing U.S. businesses on matters relating to Mexican law. Since 2017, I have served as Head of International Litigation for my U.S.-Mexico law firm.

1.4   From 1997 to 2020, I have served as a testifying expert on Mexican law in more than 150 cases around the country, not including this case. This has included cases in the United States Court of Appeals for the Fifth Circuit and United States District Courts for the:

- Southern District of Alabama,
- Central District of California,
- Northern District of California,
- Southern District of California,

2

- District of Colorado,
- District of Connecticut,
- Eastern District of Louisiana,
- Eastern District of Michigan,
- Western District of Michigan,
- District of Nevada,
- Southern District of New York,
- Western District of New York,
- Northern District of Oklahoma,
- Eastern District of Pennsylvania,
- Northern District of Texas,
- Southern District of Texas (Corpus Christi, Galveston, Houston, Laredo, McAllen and Victoria Divisions),
- Western District of Texas (Del Rio, El Paso, Midland-Odessa and San Antonio Divisions), and
- Western District of Washington.

I have testified as an expert on Mexican law in state courts and arbitral proceedings in:

- Arizona,
- California,
- Colorado,
- Delaware,
- Florida,
- Georgia,
- Illinois,
- Iowa,
- Minnesota,
- New Mexico,
- New York,
- Pennsylvania, and
- Texas (Aransas, Bexar, Cameron, Dallas, El Paso, Harris, Hidalgo, Jefferson, LaSalle, Maverick, Montgomery, Parker, Starr, Tarrant, Travis, Val Verde, Webb and Wilson counties).

I have provided expert testimony on Mexican law on behalf of the United States of America and former Attorney General Lorreta Lynch; on behalf of major institutions, such as the Archdiocese of Los Angeles; on behalf of major companies, such as Aeromexico, Daimler Chrysler, Bell Helicopter, Alcoa Fujikura, Nissan, Siemens Power Corporation, Goodrich Corporation, UPS, Sherwin-Williams and Halliburton Energy Services; and on behalf of many individuals and small companies, including Mexican Boxer Saul "Canelo" Alvarez.

Since 1997, I have been retained as a Mexican law expert by lawyers from Mexico, Canada and Scotland as well as from Arizona, California, Connecticut, Colorado, Florida, Georgia, Illinois, Iowa, Louisiana, Massachusetts, Minnesota, New York, Oklahoma, Pennsylvania, Texas, Washington and Washington, D.C.

I have served as a <u>consulting</u> expert on Mexican law on hundreds of matters over the years.

1.5 I have been asked to opine on the allegations that Cross Claim Defendant Michael Joseph Roberts, Sr. has failed to comply with this Court's injunction from the perspective of whether, under Mexican law, it was possible for him to comply therewith. I reserve the right to supplement my opinions as requested by the Court or Mr. Roberts.

1.6 In formulating an opinion on these issues I have relied on my general familiarity with Mexican law and the Mexican legal system. I have consulted the sources of Mexican law cited below. In addition, I have been provided and have reviewed a large volume of case-specific materials dating from 2015 to 2020, including the following:

- Acta Constitutiva of Riviera Country Club, S. de R.L. de C.V. (July 30, 2007),
- Poder General para Pleitos y Cobranzas (Nov. 29, 2016),
- Cross Claim and Third Party Complaint (Oct. 4, 2018),
- Motion for Preliminary Injunction and Request for Hearing (Oct. 19, 2018),
- Response to Motion for Preliminary Injunction (Oct. 29, 2018),
- Transcript of December 6, 2018 Hearing,
- Order: Submission of Competing Proposed Orders for Entry of Judgment (Jan. 14, 2019),
- Answer to Cross-Claims and Third Party Complaint and Counter Cross Claim Complaint (Feb. 22, 2019),
- Motion for Issuance of Contempt Citation (Apr. 22, 2019),
- Affirmation of Benjamin Rosen in Support of Cross-Claimants' Motion for Issuance of Contempt Citation (Apr. 22, 2019),
- Response to Motion for Contempt (May 7, 2019),
- Transcript of October 11, 2019 Hearing,
- Status Report (Nov. 13, 2019),
- Declaration of Benjamin C. Rosen (Nov. 15, 2019),
- Status Report Regarding Non-Compliance (Dec. 5, 2019),
- Response to Status Update (Dec. 11, 2019),
- Emergency Supplement to Cross-Claimants' Motion for Issuance of a Contempt Citation (Dec. 23, 2019),
- Order Re: Contempt Citation Issued to Michael J. Roberts, Sr. (Jan. 6, 2020),
- Excerpts of Transcript of January 24, 2020 Hearing,
- Findings of Fact and Conclusions of Law (June 19, 2020),
- Cross Claimants' Second Motion for Further Entry of Judgment Under Colorado Rules of Civil Procedure 54(b), 58, and 79(a) (Oct. 5, 2020),
- Order on Cross-Claimants' Motion for Sanctions (Oct. 20, 2020), and
- Order granting Cross Claimants' Second Motion for Further Entry of Judgment Under Colorado Rules of Civil Procedure 54(b), 58, and 79(a) (Nov. 13, 2020).

The conclusions that follow assume that these documents are authentic, that they accurately portray developments in this case, and that the copies of them in my possession are true and complete.

4

1.7     Based upon my review of the case materials as well as communications with and information received from Mr. Roberts' counsel in this case, I assume the following facts:

(a)     This suit arises out of a project to develop a beachfront resort called "Sereno" on Xpu-Ha Beach south of Playa del Carmen, Quintana Roo, Mexico (the "Project"). In July 2007, a group of initial investors – Timothy Flaherty ("Flaherty"), Timothy Kneen ("Kneen"), Michael Roberts, Sr. ("Roberts") and Carl Vertuca ("Vertuca") – formed a Colorado entity named PdC, LLC ("PdC") to undertake the Project. Originally, this Colorado lawsuit was brought in 2015 by other investors in the Project and Flaherty, Kneen, Roberts, Vertuca and PdC were defendants in the case.

(b)     Riviera Country Club, S. de R.L. de C.V. ("RCC"), is a Quintana Roo-based Mexican entity owned by PdC and its Colorado subsidiary PdC II. Kneen, Flaherty and Roberts were RCC's original managers.

As Mexican law requires, RCC's Articles of Incorporation (*Acta Constitutiva*) state that its foreign shareholders (PdC and PdC II) are to be considered as Mexican nationals, subject themselves to Mexican law and the jurisdiction of Mexican courts and relinquish their right to invoke the laws of their home country and its jurisdiction.

In November 2007, RCC acquired a 6.22-acre beachfront property (the "Initial Property") as part of the Project for approximately US$8.5 million. That same year, Kneen, Flaherty and Roberts, through another Colorado entity they owned, TMTBC, LLC, acquired an existing house near the Initial Property (the "Beach House") through this LLC's Mexican subsidiary called Xpu Ha, S. de R.L. de C.V. ("Xpu Ha").

(c)     In 2010, Kneen and Flaherty began offering investments in PdC.

(d)     In 2012, RCC entered into an agreement to buy the debtors' position relating to 11 acres of land between the Initial Property and Beach House consisting of 2 lots (the "Mustapha Property") for US$11.5 million. RCC paid Mustapha US$5 million, put US$1 million in escrow, and assumed Mustapha's debt to Hoteles Turisticos Unidos, S.A. ("HOTUSA"), a Spanish hotelier, for the rest. By virtue of this transaction, RCC became record owner of the Mustapha Property.

At the time of acquisition, the Mustapha Property, which was subject to a lien held by HOTUSA, was the target of ongoing foreclosure litigation, Case No. 1249/2010 in the Third Civil Court of the Cancun Judicial District (the "Foreclosure Case"), a state court in Quintana Roo. In November 2012, RCC substituted for Mustapha as the debtor and defendant in the Foreclosure Case.

According to Flaherty, Kneen, Vertuca, PdC and RCC (collectively "Claimants"), by 2014, due to the inability to obtain financing to develop the Project, PdC decided to sell all of the properties and use the sale proceeds to repay its lenders and investors.

(e)   In December 2015, RCC entered into a settlement agreement with HOTUSA (the "Settlement Agreement") under which RCC was to pay HOTUSA US$6.5 million, US$1 million up front and US$5.5 million by a date certain, and in exchange HOTUSA would release its lien against the Mustapha Property. The Settlement Agreement was negotiated by Mexican Attorney Benjamin Rosen ("Rosen") on behalf of RCC.

Under the Settlement Agreement, RCC admitted to being indebted to HOTUSA, gave HOTUSA all of the properties (the Initial Property, the Beach House and the Mustapha Property) as collateral for the debt and provided that HOTUSA could re-title the properties in the name of any third party who paid RCC's obligations thereunder. *See* Answer to Cross-Claims and Third Party Complaint and Cross Claim Complaint (Feb. 22, 2019), at ¶ 91. If RCC failed to pay HOTUSA by December 30, 2016, HOTUSA gained the right to execute upon the properties without the need for further litigation. *Id.* The Settlement Agreement provided that it was to be governed solely by Mexican law with jurisdiction resting in Mexican courts, to the exclusion of other courts.

The Settlement Agreement was approved by Kneen and Flaherty. Roberts dissented and claims that he was kept in the dark about the terms of the Settlement Agreement until after it was executed. *Id.* at 13-14.

(f)   Claimants allege that, in 2016, Roberts opposed the sale of the properties, wished to buy them for himself and refused to consent to offers from potential buyers to PdC. They further allege that Roberts undertook a scheme to acquire HOTUSA's right to foreclose and misrepresented to it that he had authority to act on behalf of RCC.

In November 2016, Roberts, in his capacity as legal representative of RCC, granted Mexican attorney Juan Carlos Ramirez Garcia ("Ramirez") a General Power of Attorney for Litigation and Collections (*poder*) to act on behalf of RCC (the "Ramirez power of attorney"). Claimants contend that Roberts lacked authority to unilaterally grant the power of attorney to Ramirez on behalf of RCC.

Rosen has testified that, on December 13, 2016, Kneen, Flaherty and Roberts had reached an agreement under which Roberts would pay off the HOTUSA mortgage, restructure the mortgage and have a right to acquire the properties upon raising capital. The properties would be sold if Roberts did not raise the capital.

According to Claimants, Roberts, without disclosure to Kneen or Flaherty, instructed Ramirez to appear on behalf of RCC in the Foreclosure Case to ratify the Settlement Agreement. According to Claimants, on December 15, 2016, Ramirez, unbeknownst to them, appeared before the Third Civil Court with HOTUSA's attorney, requested recognition as attorney-in-fact for RCC and obtained the ratification.

On December 16, 2016, Roberts, acting through his entities, paid HOTUSA US$5.5

6

million to take over its rights under the Settlement Agreement and its right to foreclose. According to Claimants, on that same day, Ramirez, acting on behalf of RCC, and a Mexican attorney representing Roberts, filed a request that the Third Civil Court subrogate Roberts for HOTUSA in the Foreclosure Case. As a result thereof, Roberts stepped into HOUTUSA's shoes as lienholder and plaintiff in the Foreclosure Case.

Rosen testified that he did not learn that Roberts had paid HOTUSA until December 19, 2016 via an email from HOTUSA's general counsel and that he did not learn about Roberts and Ramirez's actions in the Foreclosure Case until January 4, 2017 when the Mexican courts reopened after the holidays.

RCC did not pay the lienholder (now Roberts) the US$5.5 million required by the Settlement Agreement to be paid by December 30, 2016, and thereby defaulted.

(g)   According to Claimants, beginning in 2017, they undertook efforts in Mexico to stop Roberts' "foreclosure efforts", "regain[ed] possession of the property from RCC" and lodged a criminal complaint with the District Attorney's Office (*Ministerio Público*) that has had the effect of precluding Roberts from conveying the properties. Claimants allege that Roberts nevertheless has continued to pursue foreclosure of the properties.

(h)   In October 2018, Claimants filed cross claims against Roberts and two of his entities in the Colorado court for breach of fiduciary duties, misappropriation of corporate opportunities from PdC and misrepresentations, "including his efforts to wrongfully interfere with [the Settlement Agreement]." *See* Cross Claim and Third Party Complaint (Oct. 4, 2018), at ¶ 8. In connection therewith, they asked the Colorado court (Judge Kenneth Plotz) to enjoin Roberts and those acting in concert with him from, among other things, undertaking actions <u>in Mexico</u> that are inconsistent with RCC's ownership of the Initial Property and Mustapha Property and with Xpu Ha's ownership of the Beach House, including further pursuit of foreclosure in the Foreclosure Case for his individual benefit and litigation in Mexico relating to the property. *Id.* at ¶ 132(A).

(i)   On December 6, 2018, Judge Plotz heard Claimants' motion for preliminary injunction and granted that motion in part to "preserve the status quo and protect the parties' rights pending the final determination of [the Colorado case]." Order Granting Motion to Amend and Motion for Preliminary Injunction (Jan. 24, 2019), at 3. The injury to PdC that Judge Plotz sought to prevent was Roberts taking assets belonging RCC and depriving Claimants of the ability to recover such assets. *Id.* at 4.

(j)   In 2018, PdC and PdC II removed Roberts as a manager of RCC, leaving only Kneen and Flaherty as its managers.

(k)   On January 24, 2019, Judge Plotz issued a Preliminary Injunction ordering Roberts, "as of the date hereof," to, among other things:

7

1) "cease all actions, direct or indirect, that are inconsistent with ownership of the Initial Property and the Mustapha Property by PdC through its subsidiary RCC, and with TMTBC's [sic] ownership of the Beach House, including without limitation his pursuit of foreclosure in his individual capacity or for his individual benefit,"

2) "instruct Mr. Juan Carlos Ramirez Garcia … to immediately cease to appear or file any writ, brief of document of any nature as the agent or attorney-in-fact of RCC before any natural or legal person, public or private, administrative or jurisdictional authorities," and

3) "take all actions necessary to revoke or terminate any purported power of attorney granted to any person, including Mr. Juan Carlos Ramirez Garcia, to act on behalf of RCC and advise the Mexican Courts in any proceeding affecting the title to the Initial Property, the Mustapha Property or the Beach House, of the terms of this injunction."

*Id.* at 5 & 7.

(l)     On April 22, 2019, Claimants moved to hold Roberts in contempt for allegedly violating the Preliminary Injunction. They claimed among other things that, after January 24, 2019, Roberts:

• through Ramirez, filed several documents in Mexican courts in February 2019 in a manner inconsistent with the ownership of the properties, in which Ramirez appears on behalf of RCC, in which Roberts holds himself out as an owner or person who controls RCC, and in which Roberts took action to assert himself as a subrogated creditor of RCC,

• failed to instruct Ramirez to immediately cease to appear as the agent or attorney-in-fact of RCC, and

• failed to revoke or terminate Ramirez's power of attorney to represent RCC.

*See* Motion for Issuance of Contempt Citation (Apr. 22, 2019), at 6-8. Claimants' contention was that such conduct was altering the status quo and was an effort by Roberts to take the properties for his own benefit. *Id.* at ¶¶ 40 & 41. Among other things, Claimants sought an award of damages "including the value of lost property." *Id.* at 10.

(m)    On October 11, 2019, the Colorado court (Judge Eric Johnson) conducted a show cause hearing and issued an order finding Roberts in contempt for violating the Preliminary Injunction.

(n)     On October 17, 2019, in accordance with Judge Johnson's order during the October

8

11, 2019 hearing, Roberts filed in the Foreclosure Case in Mexico a document informing the Mexican judge that the Colorado court ordered Roberts to suspend the enforcement process in the Foreclosure Case that the Mexican court had ordered.

Further, via the filing, Roberts informed the Mexican court that:

- he revokes all powers of attorney previously given to Ramirez and others,

- he shall cease all further efforts related to the properties involved in the case,

- the Colorado court requests that its order be given full force and effect and be granted all courtesies as a foreign judgment that affects the properties,

- he shall not appear before the Mexican court again on behalf of RCC,

- he shall cease and desist from any action in the court as subrogated creditor of RCC or owner of the properties and to execute on the lien, and

- Ramirez shall hereafter rescind any representation of RCC and immediately cease any appearance or filing as agent or attorney for RCC.

*See* Response to Status Update (Dec. 11, 2019), Exh. B.

(o)     In a status conference on October 28, 2019, Judge Johnson noted his concern with Roberts' alleged failure "to withdraw or dismiss foreclosure proceedings" and lack of "revocation of power of attorney before a notary." The Court then ordered "new pleadings to be filed in Mexico as soon as possible" and expressed that it "does not see how it can take more than a week" to do so.

(p)     Claimants allege that, even after the October status conference, Roberts failed to file documents in Mexico that they prepared to effectuate the injunction and that Ramirez made additional filings in which he held himself out as RCC's attorney. Such filings by Ramirez included simple, non-substantive requests that the Mexican courts issue certified copies of certain case records.

Claimants acknowledge that, despite Roberts' October 17, 2019 filing in Mexico, the Third Civil Court declined to dismiss the enforcement proceeding in the Foreclosure Case and continued to recognize the Ramirez power of attorney as valid. On November 6, 2019, the Mexican Court:

- stated that it could not act in accordance with Roberts' filing in view of the state of execution resulting from its prior court orders,

- put all parties on notice that the jurisdiction and law governing execution is that of the State of Quintana Roo, Courts of the State of Quintana Roo

9

and particularly of the Third Civil Court,

- stated that foreign jurisdiction and foreign law was inadmissible and inapplicable, and

- put all parties on notice not to file frivolous or improper motions and that they would be subject to disciplinary action and/or criminal punishment if they did so.

Response to Status Update (Dec. 11, 2019), Exh. A.

In a Declaration filed on November 15, 2019, Rosen, an attorney for Claimants, acknowledged that enforcement of Roberts' lien on the properties could be dismissed only if Logistics Mexico Desarrollos Inmobiliarios y Publicitarios, S. A. de C.V. ("Logistics"), a Mexican entity controlled by Roberts and to which he assigned certain rights in the properties, participated in such dismissal, without regard to whether Logistics was subject to the Colorado court's jurisdiction.

(q)     In a November 14, 2019 status conference, Judge Johnson "ordered Mr. Roberts to execute whatever documents were necessary to return clean title to the Properties to RCC and do so within 14 days after having received drafts of such documents by [Claimants]." Status Report Regarding Non-Compliance (Dec. 5, 2019), at ¶ 5. Claimants allege that, although they provided such drafts to Roberts' Colorado attorney, Roberts did not execute such documents. The drafts consisted of an assignment of rights from Roberts and Logistics to RCC, a filing to secure the Third Civil Court's ratification of the assignment and a document canceling Roberts' mortgage on the properties.

Roberts response to the Claimants' allegations was that the drafts exceeded the Colorado court's order by attempting to "fully revisit the Mexican court case and attempt to void the decisions made by those courts" and, further, that the judge of the Third Civil Court had issued an order threatening criminal liability against anyone who attempted to revisit matters that already had been finally adjudicated. Response to Status Update (Dec. 11, 2019), at ¶¶ 1-2. According to Roberts, it was the Colorado court's intent that he simply transfer his interests in the properties to RCC and avoid further proceedings in the Mexican courts. *Id.* at ¶ 3.

(r)     On December 11, 2019, Roberts informed Judge Johnson of the Third Civil Court's November 6, 2019 admonishment against further filings in the Foreclosure Case. In addition, on that day, Roberts presented the Colorado court the form of an assignment of his enforcement rights in the Foreclosure Case to RCC that he was prepared to sign. *See* Response to Status Update (Dec. 11, 2019), at 2-3 & Exh. C.

(s)     On December 16, 2019, Judge Johnson held an additional status conference. At that time, he issued a bench warrant for Roberts' arrest.

According to Claimants, that same day, in a Mexican *amparo* proceeding (No.

829/2018), Ramirez filed a claim for damages on behalf of Roberts as owner of the properties and against RCC for its attempts to prevent foreclosure on the properties. Emergency Supplement to Cross-Claimants' Motion for Issuance of a Contempt Citation (Dec. 23, 2019), at 2.

(t)     On January 6, 2020, Judge Johnson held Roberts in contempt for failing to comply with paragraphs 1, 7 and 8 of the Preliminary Injunction.  The Court found that Roberts and Ramirez continued to file documents in furtherance of the Foreclosure Case, continued to appear in Mexican courts on behalf of RCC and that Roberts failed to revoke or terminate the Ramirez power of attorney and that Ramirez continued to file documents in Mexican courts on behalf of RCC and Roberts. *See* Order Re: Contempt Citation issued to Michael J. Roberts, Sr. (Jan. 6, 2020), at 2.

Judge Johnson ordered Roberts to undertake certain actions, including transferring any ownership interest he and Logistics have in the properties to RCC, to cease actions in Mexico for damages against RCC and to terminate the authority of Ramirez and others in Mexico to do any legal work of any type on behalf of RCC.

Effective January 8, 2020, Judge Johnson fined Roberts US$1,000 per day and ordered his confinement "until the contempt is purged."

(u)     On June 19, 2020, Judge Johnson issued *Findings of Fact and Conclusions of Law*. Among other things, the Court concluded that Roberts, acting alone, lacked power under Mexican law to grant a power of attorney to Ramirez or to appoint him or order him to appear in a Mexican court on behalf of RCC.  Further, the Court concluded that Roberts "attempt to foreclose on [the Mustapha Property] for himself, at the expense of RCC, "violated his fiduciary duties to PdC and its stakeholders."

(v)     On July 9, 2020, Judge Johnson reduced US$186,000 in fines that had accrued against Roberts to a judgment in favor of PdC, Lang, the Claimants and RCC.

(w)     On August 8, 2020, Claimants filed a motion in the Colorado case alleging that "Roberts remains in contempt of this Court's injunction, and has thus refused to return the properties to [RCC] with clean title" and "has rendered it nearly impossible to market the properties and sell them."  Cross-Claimants' Motion to Amend Cross Claim and Third Party Complaint (Aug. 8, 2020), at ¶ 2.

(x)     On October 5, 2020, Claimants filed a new motion with Judge Johnson explaining that, on September 3, 2020, Roberts had executed several documents to be filed in Mexico, including a dismissal of the Foreclosure Case, a revocation of the Ramirez power of attorney, cancellation of Logistics' mortgage on the properties, an assignment of claims from Logistics to RCC, and a recognition of the assignment; however, they alleged that the dismissal had not been filed in Mexico, that Roberts continued to seek damages against RCC in Mexico and that the revocation of the power of attorney still had to be executed before a Mexican notary. *See* Cross Claimants' Second Motion for Further Entry of Judgment Under Colorado Rules

of Civil Procedure 54(b), 58 and 79(a) (Oct. 5, 2020), at 2-3. Claimants also requested an award of additional contempt fines against Roberts.

(y)     On October 26, 2020, Roberts filed a Withdrawal of the Enforcement Action (*Desistimiento de la Acción de Ejecución*) in the Seventh District Court of the City of Cancun in Amparo Indirecto No. 829/2018. In the filing, Roberts informed the Mexican court of the terms of the Colorado court's Preliminary Injunction and that, to comply therewith, he asked the Mexican court to dismiss the damages action with prejudice.

(z)     On November 13, 2020, Claimants filed an additional motion with the Colorado court alleging that Roberts remained in contempt because the dismissal of the Foreclosure Case had yet to be filed in Mexico, he was continuing to collect damages from RCC in Mexico and that the revocation of the Ramirez power of attorney remained pending with the Mexican Consulate in Denver. *See* Cross Claimants' Second Motion for Further Entry of Judgment Under Colorado Rules of Civil Procedure 54(b), 58 and 79(a) (Nov. 13, 2020), at 3.

(aa)    As of December 2020, RCC remains the record owner of the Initial Property and Mustapha Property in the Mexican real property registry and Xpu Ha remains the record owner of the Beach House. Although Roberts remains a lienholder of record, none of the properties has been titled in Roberts' or Logistics' names.

## II.  The Mexican Legal System Generally

2.1     Structure. Mexican government operates according to a federal structure. The federal government maintains a court system with its own body of jurisdictional, procedural and evidentiary rules as do each of the 31 Mexican states and Mexico City. In addition, there exists in Mexico a body of federal substantive law and a separate body of substantive law in each of the states and Mexico City.

2.2     Sources of Mexican law. There are a variety of sources of law in the Mexican legal system, including constitutions, statutes, codes, official norms, regulations and judicial rulings. *See* S. Zamora, *et al*., MEXICAN LAW 77-94 (Oxford 2004). Not all of those sources of law are of equal weight or preeminence; rather, a hierarchy of law exists in the Mexican legal system that dictates the relative importance and ordering of the various sources of law. *See id*. at 94-101.

2.3     The single most important source of law in Mexico is the Mexican Constitution of 1917 (*Constitución Política de los Estados Unidos Mexicanos*). In Mexico's hierarchy of legal sources, the federal Constitution dominates all other laws. Like the Constitution of the United States, the Mexican Constitution contains a Supremacy Clause that renders Mexican federal law supreme over state law. Article 133 of the Constitution states:

> *This Constitution, the Laws enacted by Congress pursuant thereto and all Treaties made, or which shall be made, by the President of the Republic with the Senate's approval, shall be the supreme Law of the Union. The*

12

*judges in every State shall be bound by said Constitution, Laws and Treaties, notwithstanding anything to the contrary in the constitutions or laws of the States.*

Const., Art. 133.[1]

2.4    Statutes passed by Mexican legislative bodies are an important body of law in the Mexican legal system. *See* Zamora, *supra*, at 80.

2.5    Because Mexico is a Civil Law country, codes play a primary role in defining the relative legal rights and obligations of parties. Codes are unitary works that attempt to integrate all norms of a distinct branch of law in a systematic, comprehensive, organized and logical manner. Mexico has distinct codes to regulate civil matters, criminal matters, commerce, tax matters, civil procedure and criminal procedure. The federal government and each of the 31 Mexican states and Mexico City possess separate sets of codes. For the most part, state codes parallel the provisions and language of the federal codes.

2.6    Among Mexican codes, none is more central than the civil code. The *Código Civil Federal* ("Federal Civil Code") governs throughout the country in federal matters. The State of Quintana Roo's version of the civil code is the *Código Civil para el Estado de Quintana Roo* ("Civil Code of the State of Quintana Roo" or "CCQR").

2.7    As a general matter, Mexican civil codes cover all matters in the civil legal realm, including the civil status of individuals, family law, assets, property, succession, contracts and other forms of civil obligations. Mexican civil codes do not provide for a series of torts like those found in Common Law jurisdictions; rather, rules concerning civil liability between private parties are set forth in the portion of the civil codes titled "Obligations" (*De las Obligaciones*). The law of obligations encompasses not only tort theories but also contract and quasi-contract theories of legal duty.

### III.    Roberts' Inability to Comply with the Preliminary Injunction in Mexico

**Question**:    Did the Colorado court order Roberts to do or cease doing acts in Mexico that, as a matter of Mexican law, he could not do or cease doing?

**Short Answer**:    Yes. In view of activity in the Foreclosure Case that predated the issuance of the Preliminary Injunction by a couple of years and the Mexican law governing such cases, it was not possible for Roberts to comply with paragraph 1 of the Injunction by ceasing pursuit of execution of his lien against RCC in the Foreclosure Case.

---

1 Copies of the Mexican law provisions cited in this Affidavit are set forth in **Exhibit 2**. An English translation of those provisions is set forth in **Exhibit 3**.

3.1   The clearest example that the Preliminary Injunction ordered Roberts to act in a Mexican court in a way that was illegal or not possible under Mexican law relates to paragraph 1 of the Preliminary Injunction. In that paragraph, Judge Plotz ordered Roberts to "cease all actions, direct or indirect, that are inconsistent with ownership of the Initial Property and the Mustapha Property by PdC through its subsidiary RCC, and with TMTBC's [sic] ownership of the Beach House, including without limitation his pursuit of foreclosure in his individual capacity or for his individual benefit ...." The evidence shows that it was not possible for Roberts to comply with this directive in the Foreclosure Case.

As a matter of Mexican law, Judge Plotz did not have jurisdiction (*competencia*) to order the judge of the Third Civil Court to cease all actions in the Foreclosure Case. Similarly, Judge Plotz did not have authority under Mexican law to force Roberts to compel the Mexican court to cease all actions in the Foreclosure Case.

3.2   The ratification of the Settlement Agreement by HOTUSA and Ramirez on behalf of RCC on December 15, 2016 – which was over 2 years before the Preliminary Injunction issued – was a crucial event because it constituted the Mexican court's adoption of the agreement not as merely an arrangement between private parties but as an order of the Court itself. Thus, the provision in the Settlement Agreement that HOTUSA was entitled to execute upon the properties if RCC defaulted and put title into Roberts' name (or that of his designee) without the need for further litigation in the Foreclosure Case was rendered a directive of the Mexican court. From that Court's perspective, once the Settlement Agreement was ratified, there was no altering the consequences of a default by RCC – the matter was closed, *res judicata*. To later attempt to alter the terms of the Settlement Agreement would be to suggest that the parties committed a fraud upon the Mexican court when they presented it to the Court and then later sought its ratification.

Roberts' subrogation for HOTUSA on December 16, 2016 – which similarly was over 2 years before the Preliminary Injunction issued – also was a crucial event because once Roberts substituted for HOTUSA under the Settlement Agreement it became unavoidable (absent a further subrogation) that execution on the properties in favor of Roberts individually would occur if RCC defaulted, which it did on December 30, 2016.

Once these 2 pivotal events occurred, it was not possible thereafter for Roberts to cease pursuit of execution if RCC defaulted because, from the perspective of the Mexican court, the matter was closed and not subject to alteration. Thus, when Judge Plotz ordered Roberts on January 24, 2019 to "cease all actions, direct or indirect, that are inconsistent with ownership of the [properties by RCC and Xpu Ha], including without limitation his pursuit of foreclosure in his individual capacity or for his individual benefit," it was not possible for Roberts to do that in the Third Civil Court. Similarly, when Judge Plotz ordered Roberts on January 24, 2019 to cease "efforts to misappropriate ownership or control of the Initial Property, the Mustapha Property or the Beach House," it was not possible for Roberts to comply in the Third Civil Court in Mexico.

In this context, Roberts was caught between a U.S. court not trained in Mexican law ordering him (subject to the penalty of contempt) to do something in a Mexican court that

14

the Mexican judge in charge of that court told Roberts he could not do.[2] This conundrum is especially insidious for Roberts because, as a layperson, he understands what the Colorado court is ordering him to do but also has to rely on his Mexican lawyer's explanation of why that was not possible in the Mexican court and advice about what he can or must do under Mexican law – a body of law that Roberts, like the Colorado judge, is not capable of independently analyzing, assessing and understanding. This is a situation in which Roberts himself is unable to articulate authoritatively to Judge Johnson the reasons why he cannot comply with the Preliminary Injunction. Whereas it is said that jailed contemnors hold the key to their own jail cells, when a lay contemnor's ability to avoid committing contempt is subject to the laws and practices of a foreign legal system (that is alien to his native legal system and that operates solely in a foreign language) he may not even know that a key exists or, if it does, where it is.[3]

3.3    The Third Civil Court's view that the Foreclosure Case was fully and finally adjudicated by the ratification of the Settlement Agreement on December 16, 2016 (except as to execution), with *res judicata* effect, is supported by longstanding Quintana Roo law. Under Mexican law, the laws of the State of Quintana Roo including its Civil Code govern all persons in the State as well as real property located therein, unless otherwise controlled by Mexican federal law. CCQR, Arts. 2 & 17.

Under the Civil Code of Quintana Roo, settlements are defined as contracts by which parties, making reciprocal concessions, terminate a present dispute or avoid a future one. CCQR, Art. 3134(¶ 1). The HOTUSA-RCC Settlement Agreement in this case was a contract that both terminated the then existing dispute over HOUTSA's right to foreclose and resolved future disputes over its right, if RCC defaulted, to execute upon its lien without having to pursue further litigation. Quintana Roo law directs that settlements are to be in a writing that the parties ratify before the Mexican court when the settlement will conclude the judicial contest. CCQR, Art. 3134(¶ 2). In this case, as a matter of Mexican law, the ratification of the Settlement Agreement concluded the Foreclosure Case, except as to execution – just as a U.S. court judgment fully and finally adjudicates a lawsuit, except as to execution of the judgment. Moreover, under Quintana Roo law, a settlement has, with respect to the parties, the same effect and authority as *res judicata*. CCQR, Art. 3141.

Moreover, it is a fundamental principle of Mexican law generally and of Quintana Roo law in particular that parties cannot exempt themselves from observance of the law by agreement or alter the law by agreement. CCQR, Art. 8. Thus, even if all of the parties and the Colorado court desired that the Mexican judge in the Foreclosure Case act in a manner inconsistent with Mexican law by terminating or suspending the execution of Roberts' lien, the Mexican judge had no discretion to do so. *See also* CCQR, Art. 20

---

2 The Mexican court's November 6, 2019 admonishment of Roberts (see ¶ 1.7(p) *supra*) for filing a document to inform it of the Preliminary Injunction and order to terminate the execution proceeding proves that the Mexican court was unwilling to entertain any alteration of the proceedings that ratification of the Settlement Agreement and RCC's default on it had set in motion.

3 *See, e.g.,* Transcript of December 6, 2018 Hearing at 186:24-187:2 (Attorney Leone asks Roberts: "I'm just trying to figure out, are you denying that Juan Carlos acts at your direction?" Roberts responds: "He determines the course of legal action; I don't. I'm not an attorney.").

15

("Judicial disputes of a civil nature shall be resolved in strict adherence to the letter of the law and its judicial interpretation and, in the absence of law, shall be resolved in accordance with general principles of law.").

## IV. Roberts' Conduct in Relation to the Objectives of the Preliminary Injunction

> **Question**:  Did Roberts' acts or omissions of non-compliance with the Preliminary Injunction and other Colorado court orders defeat the injunction's objectives of preserving the status quo as of January 24, 2019 and preventing Roberts from taking assets belonging to RCC?

> **Short Answer**:  It does not appear so.  The essential components of the status quo on January 24, 2019 were that RCC and Xpu Ha were the record owners of the properties, that the properties were within the control of entities controlled by Claimants and that they were subject to a US$5.5 million lien – all of which remains the case today.  The post-January 24, 2019 activity in Mexico concerning the Ramirez power of attorney and spats between the Mexican lawyers, including accusations of criminal misconduct, largely have been tangential to the core objectives of the Preliminary Injunction.  And while it is true that Claimants are in a worse position now than they were on January 24, 2019 in the sense that they have incurred additional attorney's fees and expense, a substantial portion of those costs are due to them pursuing proceedings in Mexico that were improper under Mexican law and that they lost.

4.1     In issuing the Preliminary Injunction on January 24, 2019, Judge Plotz stated that the purpose was to "preserve the status quo and protect the parties' rights pending the final determination of [the Colorado case]" and that the injury to PdC that he sought to prevent was Roberts taking assets belonging RCC and depriving Claimants of the ability to recover such assets.  *See* Order Granting Motion to Amend and Motion for Preliminary Injunction (Jan. 24, 2019), at 3-4; *see also* Transcript of Dec. 6, 2018 Hearing, at 205:24-206:9.

4.2     In Mexico, the status quo as of January 24, 2019 was as follows:

- RCC was the record owner of the Initial Property and Mustapha property in the official Mexican real property records,

- Xpu Ha was the record owner of the Beach House in the official Mexican real property records,

- by virtue of the Settlement Agreement negotiated by Rosen and approved by Flaherty and Kneen, all of the properties were encumbered by a US$5.5 million lien,

16

- Ramirez possessed a power of attorney to act on behalf of RCC that, rightly or wrongly, he had been granted by Roberts as a manager of RCC,

- the Settlement Agreement had been ratified by the Third Civil Court,
- Roberts had paid HOTUSA US$5.5 million to take over its rights under the Settlement Agreement and in the Foreclosure Case,

- the Third Civil Court had subrogated Roberts for HOTUSA as lienholder and plaintiff in the Foreclosure Case, and

- in addition to efforts in the Colorado court, Claimants were pursuing efforts in Mexican courts and before Mexican criminal authorities to preclude Roberts from titling or conveying the properties and to revoke the Ramirez power of attorney.

*See* ¶ 1.7 *supra*. Based on the information provided to me, at the present time, RCC and Xpu Ha continue to be record owners of the properties, the properties continue to be subject to a US$5.5 million lien, the Ramirez power of attorney remains in effect and the Claimants continue to be embroiled in tangential proceedings concerning the Ramirez power of attorney. The issue does not appear to be that the status quo as it existed on January 24, 2019 has changed but that components of that status quo in Mexico have <u>not</u> changed, *i.e.*, the Ramirez power of attorney has not been revoked and Roberts has not cancelled, withdrawn or assigned his lien on the properties.

4.3   While there are examples of Roberts not immediately doing what he was enjoined to do in Mexico and of Ramirez performing acts in Mexico inconsistent with the Preliminary Injunction, over time Roberts ultimately performed many of the actions he was ordered by Judge Plotz and Judge Johnson to perform. This includes the following:

- on October 17, 2019, Roberts filed a document in the Foreclosure Case in Mexico informing the Mexican court that he had been ordered by the Colorado court to suspend execution of his lien on the properties and of the specific terms of the Preliminary Injunction (and within days of that filing, Roberts was admonished by the Mexican court that such filing was improper, the it was the Mexican court's place and not that of the Colorado court to control the execution process and that further filings inconsistent with the continuation of that process would subject Roberts to discipline or criminal punishment);

- on December 11, 2019, Roberts presented Judge Johnson the form of an assignment to RCC of his execution rights in the Foreclosure Case that he was prepared to sign;

- on September 3, 2020, Roberts executed several documents to be filed in Mexico, including a dismissal of the Foreclosure Case, a revocation of the Ramirez power of attorney (which remains in process in the Mexican Consulate in Denver), cancellation of Logistics' mortgage on the properties, an assignment of claims from Logistics to RCC, and a recognition of the assignment; and

17

- on October 26, 2020, Roberts filed a *Withdrawal of the Enforcement Action* in the federal court in Cancun in Amparo Indirecto No. 829/2018, including informing that court of the terms of the Preliminary Injunction and asking it to dismiss the damages action with prejudice.

4.4    Why is it that the core objectives of the Preliminary Injunction have been fulfilled in Mexico despite Roberts' non-compliance or delay in compliance and Ramirez's conduct inconsistent with the Injunction?

There appear to be at least 3 factors at play here. First, the criminal complaint filed by Claimants with the *Ministerio Publico* in Mexico in 2017 and the resulting embargo on any further disposition of the properties has succeeded in preventing Roberts from titling the properties in his name (or that of his designee) and, therefore, from transferring or otherwise disposing of the properties. Second, although the Third Civil Court has refused to halt the execution phase of the Foreclosure Case, Roberts has not completed execution and transferred title to the properties out of RCC and Xpu-Ha's names.

Third, although Ramirez's power of attorney has yet to be revoked by Roberts or invalidated by a Mexican court, much of Ramirez's post-January 24, 2019 use of that power of attorney has been inconsequential to the core objectives of the Preliminary Injunction. According to Ramirez, a majority of the Mexican court appearances he made as attorney-in-fact for RCC in 2020 have been simple requests for certified copies of court records. In Mexico, unlike in the U.S. legal system, court files are not matters of public record – only the courts, parties and attorneys of record can access court records and, to obtain certified copies thereof, a formal, written request to the court is required. Clearly, the act by Ramirez of requesting certified copies from Mexican courts – the equivalent of a U.S. lawyer requesting certified copies from a U.S. court clerk – is in and of itself a non-substantive act.

Ramirez's other recent appearances using the RCC power of attorney have been in cases including Case No. 829/2019-III (an amparo case relating to the Ramirez power of attorney), Case No. 41/2020 (a criminal case in which Ramirez alleges that RCC's Mexican lawyers committed crimes against him) and Criminal Investigation No. 13388/2020 (arising out of criminal accusations by Rosen on behalf of RCC against Ramirez). It does not appear that these uses of the Ramirez power of attorney will result in removing title to the properties from RCC and Xpu Ha or obstruct Roberts' ability in Mexico to revoke the power of attorney.

4.5    Did Roberts have control over all of Ramirez's post-Preliminary Injunction conduct as a matter of Mexican law?

In the U.S. legal system, lawyers are subject to extensive control by their clients and regulatory bodies. U.S. law provides that lawyers are fiduciaries to their clients and must comply with client instructions unless doing so would be illegal or unethical. And U.S. clients have at their disposal disciplinary proceedings and a substantial legal malpractice arsenal to enforce those duties. Moreover, in the U.S. legal system, membership in a

18

unitary bar is mandatory and U.S. lawyers, thereby, are subject to oversight, discipline and suspension by a governing body within in the profession. The regulation of lawyers in Mexico is quite different.

In the Mexican legal system, to practice law lawyers only need to obtain a license (*cedula*) from the directorate of professions following graduation from law school. There is no requirement that they belong to or be in good standing with a bar association and they are not subject to a mandatory code of ethics or set of disciplinary standards. Moreover, legal malpractice lawsuits against lawyers are largely unheard of in Mexico and, if brought, are unlikely to result in substantial damage awards. The primary source of attorney regulation in Mexico is found in criminal law. Thus, Mexican lawyers essentially are unregulated and immune from liability for professional malpractice. In my experience, it is not uncommon for a Mexican litigator to have only *de minimis* communication with a client between the time a lawsuit is filed and when it concludes months or years later.

Based on my review of the case materials and extensive familiarity with Mexican law and the practice of law in Mexico, Roberts did not have the same degree of control over Ramirez that Roberts enjoys over his U.S. lawyers and, as a matter of Mexican law, could not dictate to Ramirez that Ramirez act strictly in accordance with the Preliminary Injunction. Ramirez, as a licensed Mexican lawyer, determined that performing certain acts – such as ceasing to pursue execution in the Foreclosure Case or ceasing to act as RCC's agent so long as the power of attorney granted him remained in effect – would violate Mexican law and that he, therefore, had a legal duty to follow Mexican law, not the Colorado court's order. Ramirez was cognizant that it is a crime in Quintana Roo for a lawyer to abandon a legal matter without justification or to use any notoriously frivolous or illegal means to try to delay or lose a judicial proceeding. *See* Código Penal para el Estado Libre y Soberano de Quintana Roo, Art. 235(I) & (IV). Violation of Article 235 subjects the offender to imprisonment for up to 4 years and suspension from law practice for up to 3 years. *Id.*

Moreover, while Quintana Roo law generally allows powers of attorney to be revoked by the grantor or renounced by the agent freely and at any time, there are reasons why a power of attorney may nevertheless need to remain in effect. For example, a person who revokes or renounces a power of attorney at an inopportune time must compensate the other party for injury it sustains as a result of the revocation or renunciation. CCQR, Art. 2852. In addition, an agent who resigns is nevertheless obligated to continue to perform the agency until the principal provides a replacement if not doing so would result in any injury. CCQR, Art. 2862. In view of this Mexican law, Ramirez reasonably could have concluded that he could not renounce the power of attorney granted to him and that he had a duty to continue to protect RCC's interests (as he understood them) by appearing in Mexican courts on its behalf, even if doing so violated paragraph 7 of the Preliminary Injunction, which Ramirez correctly concluded (as a matter of Mexican law) does not bind him. Moreover, several Mexican court rulings rejecting RCC's efforts to invalidate the Ramirez power of attorney bolstered Ramirez's determination that he was right to continue to act on behalf of RCC

under Mexican law despite a foreign court's injunction.[4]

4.6    In fairness to Roberts, some of the post-Preliminary Injunction activity that may have violated the Injunction was a response to or result of actions by RCC and its counsel (including Rosen) in Mexico that, but for such actions, would not have occurred. For example, after learning of the existence of the Ramirez power of attorney, RCC took steps in the Foreclosure Case to attempt to invalidate it. Ultimately, Mexican courts determined that the validity of the power of attorney could not be adjudicated in the Foreclosure Case because (a) that case already was closed, with *res judicata* effect, and (b) a foreclosure proceeding is not the proper type of civil case in which to invalidate a Mexican power of attorney. Unfortunately, RCC's initial, incorrect approach to contesting the Ramirez power of attorney spawned additional litigation in the Third Civil Court, an appeal and at least one amparo case – all of which was avoidable.

4.7    How did Roberts' acts or omissions contrary to the Preliminary Injunction interfere with Claimants' ability to market and sell the properties?

On August 8, 2020, Claimants told Judge Johnson that Roberts' alleged violations of the Preliminary Injunction made it "nearly impossible" to market and sell the properties. *See* Cross-Claimants' Motion to Amend Cross Claim and Third Party Complaint (Aug. 8, 2020), at ¶ 2. It is unclear what Claimants mean by the phrase "nearly impossible", although their use of that language suggests that it was possible to some degree to market and sell the properties. Further, according to the information made available to me, Claimants have failed to delineate what measures they have undertaken since January 2019 to market and sell the properties and how Roberts' conduct obstructed such efforts as a matter of Mexican law.

I declare under penalty of perjury that the foregoing is true and correct. Executed in San Antonio, Texas on December 11, 2020.

DAVID LOPEZ

SWORN AND SUBSCRIBED to before me on this 11th day of December 2020.

SARAH LINDA STAIN
Notary Public, State of Texas
Comm. Expires 07-01-2024
Notary ID 130725170

Notary Public in and for the
State of Texas

---

4 The Mexican court rulings that rejected RCC's attempt to invalid the Ramirez power of attorney were in Case Nos. 275/2017 (an appellate ruling by the Fifth Court of Appeals of ), 272/2018 (an amparo ruling), 363/2018 (an amparo review ruling) and 1249/2010 (the Foreclosure Case).

*CURRICULUM VITAE*

## DAVID LOPEZ

Cacheaux, Cavazos & Newton, L.L.P.
333 Convent Street
San Antonio, Texas  78205
Tel:  (210) 222-1642
Fax:  (210) 222-2453
*dlopez@ccn-law.com*

**EDUCATION:**

HARVARD LAW SCHOOL, Cambridge, Massachusetts
Class of 1988, J.D.
Graduation Honors: **cum laude**
Editor, HARVARD LAW REVIEW, Volumes 100 & 101

GEORGETOWN UNIVERSITY, School of Foreign Service, Washington, D.C.
Class of 1985, B.S.F.S., International Economics Major
Graduation Honors: **magna cum laude**
Member, Phi Beta Kappa

**LEGAL POSITIONS:**

CACHEAUX, CAVAZOS & NEWTON, L.L.P., San Antonio, Texas
Partner and Head of International Litigation, September 2017 to the present

PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, L.L.P., San Antonio, Texas
Partner, January 2008 to July 2017

DAVIS, CEDILLO & MENDOZA, INC., San Antonio, Texas
Partner, January 2003 to December 2007
Of Counsel, June 2001 to December 2002
Senior Litigation Associate, June 1992 to July 1993

GIBSON, DUNN & CRUTCHER, Los Angeles, California
August 1990 to June 1992
Corporate Litigation Associate

SAN ANTONIO COMMUNITY LAW CENTER, San Antonio, Texas
August 1988 to May 1990
Co-Founder, Co-Director and Staff Attorney

**PROFESSIONAL RECOGNITION:**

**Rated "AV Preeminent 5.0"** by Martindale-Hubbell



EXHIBIT
1

Master of the Bench, William S. Sessions American Inn of Court, San Antonio, Texas

Member, The Million Dollar Advocates Forum (since 2006)

## ACADEMIC POSITIONS:

ST. MARY'S UNIVERSITY SCHOOL OF LAW, San Antonio, Texas
Adjunct Professor of Law, Fall 2008, 2009, 2010 & 2012
International Commercial Arbitration Seminar (with Judge John Specia)

ST. MARY'S UNIVERSITY SCHOOL OF LAW, San Antonio, Texas
Full Professor of Law with tenure, June 1997 to May 2003
Associate Professor of Law, August 1993 to May 1997

UNIVERSITY OF CALIFORNIA - DAVIS, Davis, California
August 1997 to May 1998
Visiting Professor of Law

BAYLOR LAW SCHOOL, Study Abroad Program in Guadalajara, Jalisco, México
Summer 1996, 1997, 1998, 1999 and 2000
Visiting Professor, Universidad Autónoma de Guadalajara

## APPOINTMENTS:

Admissions Committee, U.S. District Court, Western District of Texas (2012-2018)

Advisory Board, Center for U.S. and Mexican Law, University of Houston Law Center (2012 – 2018)

Appointed by Ambassador Charlene Barshefsky, U.S. Trade Representative, to the Roster of Eligible Binational Panelists under Chapter 19 of the North American Free Trade Agreement  (April 1998 – March 2003)

## BOOKS AND BOOK CHAPTER:

Co-Author, MEXICAN LAW (together with Professor Stephen Zamora of the University of Houston Law Center and Director José Ramón Cossío Díaz, Professor Leonel Pereznieto Castro, and Professor José Roldán Xopa of the Instituto Tecnológico Autónomo de México) (Oxford University Press 2004)

Co-Author, NAFTA: A PROBLEM ORIENTED COURSEBOOK (together with Professor Ralph Folsom of the University of San Diego School of Law and Professor Michael W. Gordon of the University of Florida College of Law) (West Publishing Co. 2000)

Co-Author, 2000 DOCUMENTS SUPPLEMENT TO NAFTA: A PROBLEM ORIENTED COURSEBOOK (together with Folsom and Gordon) (West Publishing Co. 2000)

Co-Author, TEACHER'S MANUAL TO ACCOMPANY NAFTA: A PROBLEM ORIENTED COURSEBOOK (together with Folsom and Gordon) (West Publishing Co. 2000)

Author, *The Legal System of Mexico*, Chapter 3, MODERN LEGAL SYSTEMS CYCLOPEDIA (William S. Hein & Co. 2000)

## ARTICLES:

Article, *Is Mexico an "Adequate Alternative Forum" for Litigation? The Texas Supreme Court and Fifth Circuit Speak*, 71 TEX. BAR J. 270 (April 2008)

Lead Article, *Dispute Resolution Under NAFTA: Lessons from the Early Experience*, 32 TEX. INT'L L.J. 163 (1997)

Lead Article, *Dispute Resolution Under MERCOSUR from 1991 to 1996: Implications for the Formation of a Free Trade Area of the Americas*, 3 NAFTA LAW & BUS REV. OF THE AMERICAS 3 (Spring 1997)

Article, *Dispute Resolution Under a Free Trade Area of the Americas: The Shape of Things to Come*, 28 U. MIAMI INTER-AM. L. REV. 597 (1997)

Article, *Why Texas Courts are Defenseless Against Frivolous Appeals: A Historical Analysis with Proposals for Reform*, 48 BAYLOR L. REV. 51 (1996)

Note, *Reexamining the Constitutionality of INS Workplace Raids After the Immigration Reform and Control Act of 1986*, 100 HARV. L. REV. 1979 (1987)

## PUBLICATION HONORS:

Nominee, Outstanding Law Review Article - 1997, Texas Bar Foundation (for *Dispute Resolution Under NAFTA: Lessons from the Early Experience*)

## PROFESSIONAL MEMBERSHIPS:

State Bar of Texas (since 1988)
State Bar of California (since 1990)
Court of Appeals for the Second Circuit (since 2014)
Court of Appeals for the Fifth Circuit (since 2003)
Member, American Bar Association (1993-2008)
Member, Bar Association of the Fifth Federal Circuit (since 2003)
Life Fellow, Texas Bar Foundation
Fellow, San Antonio Bar Foundation
Co-Chair, Subcommittee on NAFTA, American Bar Association (1997 - 2001)
Chair, Section on North American Cooperation, AALS (2001)
Member, National Association of College and University Attorneys (2000-2001)
Chief Coodinator, ABA Conference on "Practicing Law in the Era of NAFTA: Mastering the New Global Marketplace," San Antonio, Texas (March 18-19, 1999)

## LECTURES AND PRESENTATIONS:

Speaker, "Jurisdiction and Venue – Where Does the Case Belong?," Advanced Civil Trial Course 2017, State Bar of Texas, San Antonio, Texas (July 21, 2017)

**LECTURES AND PRESENTATIONS (cont.):**

Speaker, "Pitfalls and Opportunities for the (Conscientious) Lawyer in Managing Cross-Border Legal Disputes," International Law Section of the San Antonio Bar Association, San Antonio, Texas (Feb. 10, 2017)

Speaker, "Enforcing Foreign Judgments in Texas Courts and Citation of Process upon Foreign Persons," San Antonio Bar Association, San Antonio, TX (Aug 21, 2014)

Speaker, "Mexican Law and Legal Research: Overcoming the Challenges," American Ass'n of Law Libraries 2014 Annual Meeting, San Antonio, TX (July 15, 2014)

Guest Professor, Federal Courts Class of U.S. District Judge Xavier Rodriguez, St. Mary's University Law School, San Antonio, Texas (Feb. 4, 2014)

Speaker, "Issues Relating to Mexican Law – Plaintiff/Alien," Prosecuting or Defending a Trucking or Auto Accident Case, State Bar of Texas, San Antonio (Oct. 31, 2013)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 13, 2013)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 17, 2013)

Panelist, "Dealing with Foreign Jurisdictional Property Issues," New Frontiers in Marital Property Law, State Bar of Texas, New Orleans, Louisiana (Oct. 5, 2012)

Panelist, *En Juicio: XXIV Simposium Internacional de Derecho*, Instituto Tecnológico y de Estudios Superiores de Monterrey, Monterrey, Mexico (Sept. 21, 2012)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 18, 2012)

Speaker, "A Practical Guide to Collecting Debts in Mexico," Mastering the Art of Collecting Debts and Judgments, University of Texas School of Law, Austin, Texas (Sept. 2, 2011)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 17, 2010)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 14, 2010)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 5, 2010)

Speaker, "What Texas Lawyers Need to Know About Mexican Law," San Antonio Bar Association Int'l Law Section, San Antonio, Texas (Dec. 11, 2009)

Panelist, "The Application of Mexican Law by U.S. Judges in Cross-Border Disputes," U.S-Mexico Bar Association Annual Meeting, San Diego, California (Nov. 12, 2009)

Speaker, "Spoliation and Legal Malpractice," Business Torts Institute, State Bar of Texas, Dallas, Texas (Oct. 30, 2009)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 18, 2009)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 8, 2009)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 6, 2009)

Speaker, "What Texas Lawyers Need to Know About Mexican Law," Austin Bar Association, Austin, Texas (June 20, 2008)

**LECTURES AND PRESENTATIONS (cont.):**

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 9, 2008)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 1, 2008)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 2, 2007)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 8, 2006)

Speaker, Supreme Court Review:  The 2004-2005 Term, American Public Power Association Legal Seminar, San Antonio, Texas (Nov. 13, 2005)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 16, 2005)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (March 4, 2005)

Guest Lecturer, "Comparison of the U.S. and Mexican Legal Systems," Baylor Law School Study Abroad Program, Guadalajara, Jalisco, México (August 15, 2003)

Guest Lecturer, "Intellectual Property Protection Under NAFTA," Monterrey Tec Video-conference Course (*Curso de Tratados Comerciales Internacionales de México*), from San Antonio, Texas (April 25, 2001)

"NAFTA: Emerging Issues," Annual Meeting of the State Bar of Texas, Hispanic Issues Section, San Antonio, Texas (June 24, 2000)

 "NAFTA - Recent Developments," San Antonio Bar Association International Law Section, San Antonio, Texas (June 9, 2000)

Guest Lecturer, "NAFTA," Mexican Legal Studies Program, University of Houston Law Center, Mexico City, Mexico (June 6, 2000)

 "Transnational Legal Practice Under NAFTA," Association of American Law Schools, Annual Meeting, Washington, D.C. (Jan. 9, 2000)

"NAFTA Chapter 11: Resolution of Investments Disputes," Association of American Law Schools, Annual Meeting, Washington, D.C. (Jan. 8, 2000)

"Introducción al Sistema Legal de los Estados Unidos," Summer U.S. Law Program for Mexican Judges, U.T. Law School, Austin, Texas (July 19, 1999)

"The Mexican Legal System," San Antonio Bar Association International Law Section, San Antonio, Texas (July 9, 1999)

Presenter & Facilitator, Workshop on Comparative Law Issues, U.S.-Mexico Judicial Exchange Program Border Conference, San Antonio, Texas (June 18, 1999)

Law Class Simulation, Transformational Youth Leadership Seminar, Office of Community Devel., Texas A&M University, San Antonio, Texas (June 11, 1999)

"Introducción al Sistema de Derecho de los Estados Unidos," Consejo de la Judicatura Federal (Federal Judicial Council), Veracruz, Mexico (May 7, 1999)

"NAFTA," Capstone Course, China External Trade Agency - International Trade Institute, University of the Incarnate Word, San Antonio, Texas (March 25, 1999)

"Derecho Procesal Civil Federal," Programa de Derecho Angloamericano para Abogados Iberoamericanos, Univ. of Texas School of Law, Austin, Texas (July 21, 1998)

"Las Reformas al Poder Judicial Mexicano y el Sistema Judicial de los Estados Unidos," Departamento de Derecho, Universidad de Monterrey, San Pedro Garza García, N.L., México (April 17, 1998)

**LECTURES AND PRESENTATIONS (cont.):**

Guest Lecturer, "International Trade Dispute Resolution," Harvard Law School, Cambridge,
Massachusetts (January 15-16, 1998)

"Sistemas de Derecho Contemporáneo: México-Estados Unidos," Instituto de la Judicatura
Federal, México City, México (November 7, 1997)

"Introducción al Sistema Legal de los Estados Unidos," Programa de Derecho Angloameri-
cano para Abogados Iberoamericanos, University of Texas School of Law, Austin,
Texas (July 21, 1997)

"El Derecho de Agravios ('Torts') en los Estados Unidos," Centro de Estudios de
Actualización Jurídica, México City, México (May 16, 1997)

"Frivolous Appeals Under the New Texas Rules of Appellate Procedure," Appellate Practice
Before the Fourth and Thirteenth Courts of Appeals, San Antonio & Corpus Christi
Bar Associations, Corpus Christi, Texas (May 9, 1997)

"NAFTA and Intellectual Property in Mexico," Spring Conference, International Anti-
Counterfeiting Coalition, Austin, Texas (May 8, 1997)

"Ethics for the Appellate Lawyer: Frivolous Appeals," Telephone Seminar, State Bar of
Texas, San Antonio, Texas (April 18, 1997)

"Toward a Free Trade Area of the Americas," Monthly Meeting of the International Law
Section, San Antonio Bar Association, San Antonio, Texas (April 11, 1997)

"Cuestiones Constitucionales: Estados Unidos," Pt. II, Universidad Panamericana,
Guadalajara, Jalisco, México (March 13, 1997)

"Frivolous Appeals," 10th Annual Advanced Civil Appellate Practice Course, State Bar of
Texas, Austin, Texas (September 12, 1996)

"How to Avoid and Respond to Frivolous Appeals," Monthly Meeting of the Appellate Law
Section, San Antonio Bar Association, San Antonio, Texas (July 26, 1996)

"Introducción al Sistema Legal de los Estados Unidos e Investigación Legal," Derecho
Angloamericano para Abogados de Latino América, University of Texas School of
Law, Austin, Texas (July 15, 1996)

"Comparison of Civil Law and Common Law Systems," Universidad de Anáhuac, México
City, México (March 9, 1995)

"The Common Law Tradition," Universidad de Monterrey, Garza García, N.L., México
(January 13, 1994)

**LAW SCHOOL ADMINISTRATIVE DUTIES:**

Associate Dean for Administration (1999-2001)
Director of Foreign Program Development (1998-2001)
Member, University Task Force on Distance Learning (1999-2000)
Member, University Comptroller Search Committee (1999-2000)

**COURSES ORIGINATED AND DEVELOPED:**

NAFTA Virtual Reality Seminar 2000 (Spring 2000)
International Trade Dispute Resolution (Fall 1997)
North American Legal Systems (Spring 1995, Spring 1996, Spring 1997)
Seminar on the North American Free Trade Agreement (Spring 1994, Fall 1995)



CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS

CÁMARA DE DIPUTADOS DEL H. CONGRESO DE LA UNIÓN
Secretaría General
Secretaría de Servicios Parlamentarios

*Última Reforma DOF 08-05-2020*

# CONSTITUCIÓN POLÍTICA DE LOS ESTADOS UNIDOS MEXICANOS

**Constitución publicada en el Diario Oficial de la Federación el 5 de febrero de 1917**

**TEXTO VIGENTE**
**Última reforma publicada DOF 08-05-2020**

**Artículo 133.** Esta Constitución, las leyes del Congreso de la Unión que emanen de ella y todos los tratados que estén de acuerdo con la misma, celebrados y que se celebren por el Presidente de la República, con aprobación del Senado, serán la Ley Suprema de toda la Unión. Los jueces de cada entidad federativa se arreglarán a dicha Constitución, leyes y tratados, a pesar de las disposiciones en contrario que pueda haber en las Constituciones o leyes de las entidades federativas.



EXHIBIT
2

## CÓDIGO CIVIL PARA EL ESTADO DE QUINTANA ROO

**Artículo 2.-** Las leyes del Estado se aplicarán a todos los habitantes de Quintana Roo sin distinción de personas cualquiera sea su sexo, o nacionalidad, estén domiciliadas en el Estado o se hallen en él de paso.

Las leyes que establecen excepciones a las reglas generales, no son aplicables a caso alguno que no esté expresamente especificado en las mismas leyes.

El hombre y la mujer son iguales ante la ley; en consecuencia, la mujer no queda sometida, por razón de su sexo, a restricción alguna en la adquisición y ejercicio de sus derechos civiles.

Se tendrán como principios rectores del presente Código, la perspectiva de género, la igualdad y el interés superior de la niñez.

**Artículo 8.-** Salvo que se trate de normas dispositivas, la voluntad de los particulares no puede eximir de la observancia de la ley, ni alterada, ni modificarla.

**Artículo 17.-** Los bienes inmuebles ubicados en el Estado de Quintana Roo y los muebles que se encuentren en él, se rigen por las disposiciones de este Código, aun cuando sus dueños estén domiciliados fuera de la Entidad.

**Artículo 20.-** Las controversias judiciales del orden civil deberán resolverse conforme a la letra de la ley y a su interpretación jurídica y a falta de ley se resolverán conforme a los principios generales de derecho.

**Artículo 2852.-** A excepción de los casos previstos en el párrafo final de este precepto, el mandato puede ser revocado en todo tiempo y libremente por el mandante o renunciado en igual forma por el mandatario, a pesar de que en el documento respectivo se estipule que es irrevocable e irrenunciable, pues esta estipulación será nula de pleno derecho y se tendrá por no puesta.

La parte que revoque o renuncie el mandato en tiempo inoportuno, deberá indemnizar a la otra parte de los daños y perjuicios que la revocación o la renuncia le llegare a causar a esta otra parte.

Los casos en que el mandato no puede ser revocado ni renunciado son aquéllos en los que su otorgamiento se hubiera estipulado: a) como condición para celebrar un contrato bilateral de vigencia determinada; y, b) como medio para cumplir una obligación contraída por el mandante.

**Artículo 2862.-** El mandatario que renuncie tiene obligación de seguir el negocio mientras el mandante no provee a la procuración, si de lo contrario Se sigue algún perjuicio.

**Artículo 3134.-** La transacción es un contrato por el cual las partes, haciéndose recíprocas concesiones, terminan una controversia presente o previenen una futura.

En cualquiera de ambos casos la transacción debe constar por escrito, que los contratantes deben ratificar en la presencia del Juez o tribunal de los autos cuando mediante ella se pone fin a una contienda judicial.

**Artículo 3141.-** La transacción tiene, respecto de las partes, la misma eficacia y autoridad que la cosa juzgada; pero no procederá la vía de apremio sino tratándose del cumplimiento de la transacción judicial. o de la extrajudicial, pero sólo cuando, en este último caso, el juez, a solicitud de ambas partes y siempre que no la estime contraria a derecho, la haya homologado obligando a quienes la pactaron a estar y pasar por ella con dicha autoridad de cosa juzgada.

Lo anterior no obstante, la transacción puede anularse o rescindirse en los casos generales en que se anulan o rescinden los demás contratos y negocios jurídicos y, además, en los casos a que se refieren los cinco artículos siguientes.

**CODIGO PENAL PARA EL ESTADO LIBRE Y SOBERANO DE QUINTANA ROO**

**ARTICULO 235.-** Se impondrá prisión de uno a cuatro años y suspensión hasta de tres años para ejercer la abogacía, en su caso, y privación definitiva si reincidiere, a quien:

**I.-** Abandone la defensa o negocio, sin motivo justificado;

**II.-** Asista o ayude a dos o más contendientes o partes con intereses opuestos en un mismo negocio o negocio conexos o acepte el patrocinio de alguno y admita después de la parte contraria en un mismo negocio;

**III.-** A sabiendas alegue hechos falsos o se apoye en leyes inexistentes o derogadas;

**IV.-** Usando cualquier recurso, incidente o medio notoriamente improcedente o ilegal procure dilatar o perder un juicio;

**V.-** Pida términos para probar lo que notoriamente no puede probar o no ha de aprovechar a su parte, promueva artículos o incidentes que motiven la suspensión del juicio o recursos manifiestamente improcedentes a que de cualquier otra manera procure dilataciones que sean notoriamente ilegales, o

**VI.-** Como defensor sea particular o de oficio sólo se concrete a aceptar el cargo y a solicitar la libertad caucional que menciona la fracción I del Artículo 20 de la Constitución, sin promover más pruebas ni dirigir al inculpado en su defensa.

## POLITICAL CONSTITUTION OF THE UNITED MEXICAN STATES

**Article 133.**  This Constitution, the Laws enacted by Congress pursuant thereto and all Treaties made, or which shall be made, by the President of the Republic with the Senate's approval, shall be the Supreme Law of the Union.   The judges in every State shall be bound by said Constitution, Laws and Treaties, notwithstanding anything to the contrary in the Constitutions or laws of the States.



# CIVIL CODE FOR THE STATE OF QUINTANA ROO

**Article 2.-** The laws of the State shall apply to all the inhabitants of Quintana Roo without distinction of persons regardless of their sex, or nationality, whether they are domiciled in the State or are passing through it.

The laws that establish exceptions to the general rules are not applicable to any case that is not expressly specified in the same laws.

Men and women are equal before the law; consequently, the woman is not subjected, by reason of her sex, to any restriction in the acquisition and exercise of her civil rights.

The perspective of gender, equality and the best interests of children shall be guiding principles of this Code.

**Article 8.-** Except in the case of dispositive norms, the will of private parties cannot exempt them from observance of the law, nor alter it, nor modify it.

**Article 17.-** Real property located in the State of Quintana Roo and personal property found therein are governed by the provisions of this Code, even when their owners are domiciled outside the State.

**Article 20.-** Judicial disputes of a civil nature shall be resolved in strict adherence to the letter of the law and its judicial interpretation and, in the absence of law, shall be resolved in accordance with general principles of law.

**Article 2852.-** Except for the cases provided for in the final paragraph of this precept, the mandate may be revoked at all times and freely by the principal or renounced in the same way by the agent, despite the fact that the respective document stipulates that it is irrevocable and inalienable, since this stipulation will be null and void and will be considered as not included.

The party that revokes or resigns the mandate at an inopportune time must compensate the other party for the damages and losses that the revocation or resignation will cause to such other party.

The mandate cannot be revoked or renounced in cases in which in its granting it was stipulated: a) as a condition for entering into a bilateral contract of a determined validity; and, b) as a means to fulfill an obligation contracted by the principal.

**Article 2862.-** The agent who resigns has the obligation to continue the matter while the principal does not provide a replacement, if some damage otherwise would follow.

**Article 3134.-** Compromise is a contract by which the parties, making reciprocal concessions, terminate a present controversy or prevent a future one.

In either case, the compromise must be in writing, which the contracting parties must ratify in the presence of the Judge or court of the proceedings when a legal dispute is ended by means of it.

**Article 3141.-** As between the parties, compromise has the same effect and authority as res judicata; but execution will not proceed except in the case of compliance with the judicial compromise, or extrajudicial, but only when, in the latter case, the judge, at the request of both parties and provided that he does not consider it contrary to law, has approved it obligating those who agreed to be bound by said authority of res judicata.

Notwithstanding the foregoing, the compromise may be annulled or rescinded in the general cases in which other contracts and legal transactions are annulled or rescinded and, furthermore, in the cases referred to in the following five articles.

**CRIMINAL CODE FOR THE FREE AND SOVEREIGN STATE OF QUINTANA ROO**

**ARTICLE 235.-** Imprisonment of one to four years and suspension of up to three years from the practice of law will be imposed, if applicable, and permanent suspension if he reoffends, on one who:

**I.-** Abandons the defense or matter, without justification;

**II.-** Assists or helps two or more opponents or parties with opposing interests in the same matter or related matter or accepts the sponsorship of one and later concedes to the opposing party in the same matter;

**III.-** Knowingly alleges false facts or relies on non-existent or repealed laws;

**IV.-** Uses any notoriously improper or illegal appeal, ancillary proceeding or means to try to delay or lose a proceeding; ....